Filed 3/20/26  P. v. Heredia CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CATARINO HEREDIA,<br><br>    Defendant and Appellant. | E084124<br><br>(Super.Ct.No. RCR18132)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Daniel W. Detienne, Judge.  Affirmed.

David P. Lampkin, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters and Charles C. Ragland, Chief Assistant Attorneys General, Stephanie Chow and Elana Miller, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Catarino Heredia appeals from the trial court's denial of his petition to vacate his 1991 attempted murder conviction. (Pen. Code,[1] § 1172.6.) Had the petition been granted, defendant, now age 57, sought resentencing on his conviction for the remaining offenses he committed with an older coperpetrator when he was 22 years old in 1990. Defendant's appellate briefing commenced initially with a no-issue brief filed by appointed counsel requesting our independent review for arguable issues. (Citing *Anders v. California* (1967) 386 U.S. 738; *People v. Wende* (1979) 25 Cal.3d 436; but see *People v. Delgadillo* (2022) 14 Cal.5th 216, 228 [holding that *Anders/Wende* mandatory independent review does not apply to postconviction appeals arising under § 1172.6].) Defendant in his supplemental brief (see *Delgadillo*, at p. 232) faulted the trial court for not expressly addressing at the section 1172.6 evidentiary hearing whether his relative youth factored into the court's determination that he was guilty beyond a reasonable doubt of attempted murder. On the evidence presented at the hearing, the court as the trier of fact found defendant harbored express malice in directly aiding and abetting the victim's near-slaying.

Defendant's alternate defender had raised the issue of defendant's youth at the evidentiary hearing, citing *People v. Pittman* (2023) 96 Cal.App.5th 400 (*Pittman*). (See *id.* at pp. 416-418 [finding the defendant's youth, at age 21, relevant to guilt determination in section 1172.6 proceedings, under consensus emerging case law].) We vacated submission of the matter under *Delgadillo* and requested that the parties address

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

*Pittman*-related issues on the merits. The parties have done so ably and on our review, as we discuss *post*, we cannot say the trial court erred regarding consideration of defendant's youth. The issue was, as our full review discloses, raised multiple times over the course of several continued hearings and we must credit the trial court's statement it would consider *Pittman*. Nor similarly do we find any ineffective assistance of trial counsel (IAC) in not pressing for an express ruling regarding the effect, if any, of defendant's relative youth—given that counsel repeatedly raised the issue. In the absence of error or IAC, we therefore affirm the trial court's ruling denying defendant's section 1172.6 petition.

## BACKGROUND

In a joint trial with codefendant Victor Randy Lopez, the jury convicted defendant of attempted murder (§§ 664, 187, subd. (a)), count 1), kidnapping for robbery (§ 209, subd. (b), count 2), second degree robbery (§ 211, count 3), and automobile grand theft (former § 487(3), count 4). The jury found enhancement allegations true that as to count 1, a principal was armed with a firearm (§ 12022, subd. (a)(1)) and that Lopez personally used a firearm in committing the attempted murder (§ 12022.5). The jury further found on counts 1, 2, and 3 that Lopez personally inflicted great bodily injury on the victim, and on counts 2, 3, and 4 that Lopez and defendant each personally used firearms (§ 12022.5). The jury rejected the allegation that defendant committed the attempted murder with premeditation and deliberation, but found that Lopez did so.

In January 1992, the trial court sentenced defendant to determinate and indeterminate prison terms. The determinate term was 13 years, consisting of

3

consecutive terms of 7 years for the attempted murder, an additional year because a principal was armed, and 5 years for defendant's firearm use on another count, to be followed by an indeterminate life term—with the possibility of parole—for the kidnapping for robbery count. The court entered a stay on each of the remaining counts and allegations. This Court affirmed the judgment in an unpublished opinion. (*People v. Heredia* (Oct. 22, 1993, E010647) [nonpub. opn.].)

In May 2023, defendant filed his section 1172.6 petition to vacate the attempted murder conviction and for resentencing. The prosecution opposed defendant's requested relief under the statute, but agreed the petition stated the necessary prima facie case to proceed to an evidentiary hearing. The trial court issued an order to show cause (OSC) setting an evidentiary hearing, which was continued several times. The court conducted the hearing over several days in February, March, and June of 2024.

Defense counsel's opening statement at the hearing summarized defendant's contention that his attempted murder conviction must be vacated under current law because the evidence "will fail to show beyond a reasonable doubt that Mr. Heredia had an intent to kill back in 1990." This included because he "was in the presence of a much older, more experienced individual who was the codefendant, Mr. Lopez."

Defense counsel's opening statement previewed the evidence towards granting defendant's petition in relevant part as follows. Lopez had "an angry relationship" with the victim, claiming "over several months" that the victim owed a debt, resulting in "a great deal of threats going back and forth between them," whereas Heredia had no "prior activity" or involvement with the victim.

4

"[O]n the date in question," Lopez "went to confront [the victim]," taking his (i.e., Lopez's) son with him "and [defendant] went with them." Lopez and Heredia "both had firearms" and the victim "was forced into his own vehicle," where the victim, who "indicated and testified that he was frightened," persuaded his captors to allow his friend ("Noney") to accompany them in the car. "[W]hile they were in the car," defendant was "telling Noney . . . that they're gonna let [the victim] go in a little while. They were gonna drive him around and let him go," supporting, counsel argued, the conclusion defendant "did not have an intent to kill." Counsel acknowledged that "[a]t one point [defendant] was telling [the victim] to get down, and hitting him with a gun," but, "at the same time he was telling him we're gonna let you go. This is all according to the testimony of [the victim]."

Lopez drove the victim in his car, along with defendant and Noney, to Lopez's residence, where they changed vehicles to the one Lopez's son had driven there. Noney no longer accompanied them. Still, counsel emphasized the defense's view ("we believe the evidence will show") that while "Lopez kept saying to kill" the victim, defendant "said, No, let's let him go."

Continuing the chronology of events, defense counsel outlined how the trio "arrived at a location in Riverside," which later evidence at the hearing showed was in a remote area on a frontage road. There, the victim "was ordered out of the car at gunpoint," with both Lopez and defendant "armed with firearms." The victim "tried to escape, but was stopped." Defense counsel emphasized that while Lopez "told" defendant "repeatedly to shoot" the victim, the victim's testimony was that defendant

5

"stood over him [holding] the firearm, for five or six minutes, as Mr. Lopez continually ordered [defendant] to shoot [the victim], and [defendant] refused to do so." Lopez then "took the gun away from [defendant] and shot [the victim]." The victim suffered three gunshot wounds, including one in his upper chest, but he survived. Lopez and defendant drove away.

Defense counsel acknowledged "some reference" in the prosecutor's OSC hearing brief "that my client said something about 'breaking' " while in the car with the victim, which the prosecutor alleged was slang for "shooting somebody in the car," namely the victim. Defense counsel emphasized that in the victim's testimony at Lopez's preliminary hearing—much closer in time to the offense than at trial—the victim "never says anything about [defendant] threatening to break the victim or . . . anything like that."

Defense counsel's concluding remarks in his opening statement included that the jury "did not find [defendant] was the shooter" in the attempted murder, but rather only armed vicariously as a coparticipant, and the jury rejected the premeditation allegation against defendant. Counsel noted in light of a natural and probable consequences instruction (CALJIC No. 3.02) that the jury "wasn't required to find malice aforethought" for attempted murder. In a colloquy with the court, counsel acknowledged the jury was instructed on direct aiding and abetting liability as to the attempted murder. Counsel summarized in conclusion that the "evidence in this case" for the court's consideration under section 1172.6 "will not show [attempted murder] beyond a reasonable doubt [but rather] will in fact demonstrate that [defendant] did not have an intent to kill." The court summarized its role at the hearing in similar terms: "If I believe that the People have

6

failed to prove beyond a reasonable doubt that [defendant] is guilty of attempted murder, I will be vacating his conviction."

At subsequent points and over successive days during the hearing, defense counsel returned to his opening remarks about defendant's relative youth. Counsel cited in particular *"People versus Pittman"* on the issue of defendant's "age and . . . assess[ing] specific intent." Counsel provided the reporter citations for the case and, after the court confirmed the case name ("P-I-T-T-M-A-N?"), the court stated: "I'll look at [it]."

On a later hearing date, counsel brought up *Pittman* again, emphasizing its holding "that the [trial] court [at a section 1172.6 hearing] should consider the youth of the subject in assessing whether or not he formed the requisite mental state." Counsel stated, "[T]he admissible evidence would demonstrate that Mr. Lopez was substantially older and more experienced, and in particular factually . . . that it was Mr. Lopez who had a beef with [the victim], it wasn't [defendant]." Defense counsel stressed: "So I think his age is very important."

Counsel reiterated this theme at the close of the evidentiary hearing. Arguing that when defendant "repeatedly declined to [shoot the victim] and hesitated for five or six minutes," "[i]f he had an intent to kill at that point, certainly he would have followed the order of the individual who is running the show, who is a more experienced criminal, and who has his own gun and is ordering him repeatedly to shoot the victim, and he won't do it." Counsel concluded by arguing that defendant's "conduct in this case was [as] a young man who used the firearm to aid and abet in a kidnap robbery," but "with no intent to kill on the part of [defendant]."

7

The trial court took a different view than the defense. Before making its ruling, the court engaged in a "lengthy" review of the evidence, which the court "broke . . . down into three parts," consisting of "evidence that shows [defendant] had no intent to kill," evidence he harbored that intent, and the court's conclusion as the trier of fact.

In reviewing the evidence pointing to intent to kill, the court highlighted that when Lopez and defendant "talked about what they were going to do with [the victim]," both men "each had guns pointed at him," defendant was the one who "started hitting" the victim and "had him bend down" in the car, and after Lopez "told [defendant] he wanted to break [the victim], which [the victim] took to mean kill him execution style," both defendants "ordered [the victim] out of the car at gunpoint" on the frontage road. The court noted the victim testified defendant forced him to the ground, "had a gun" in giving the order, and that it was defendant who "cut . . . off" the victim "when he was trying to get away on foot on the frontage road," stopping him by running after him and "pointing a gun at him."

The court questioned "why" defendant and Lopez "together" would "force [the victim down] onto his knees in a ditch in an isolated area at night at gunpoint," with defendant "cut[ting the victim] off at gunpoint . . . if he was just trying to [section] 245 him, assault him with a deadly weapon?" The court observed the victim "had already been assaulted with a deadly weapon before that more than once." The court also noted testimony by the victim indicating "it switched" between Lopez and defendant "at times" as to "who said he was going to break him" and who "was saying to let him go." The court acknowledged "different inferences you can take from that," including "perhaps

8

some psychological ploy to keep [the victim] compliant until they got to their destination." The court, "at the end of the day," returned to the fact that "both" Lopez and defendant "working together forced [the victim] on his knees at gunpoint in a ditch in an isolated area and prevented him from escaping." The court earlier had noted the victim testified that at this moment "he had no doubt that they, he used the word 'they,' they were going to kill him."

Ultimately, the court adopted the view argued by the prosecutor at the underlying trial. The court concluded, referencing the prosecutor's argument: "This is a direct quote, '[Defendant] wanted him dead. He just did not want to be the trigger man.'" The court found "beyond a reasonable doubt [that] defendant had the intent to kill, he just did not want to pull the trigger." Determining that defendant "directly aided and abetted [Lopez] with the intent to kill beyond a reasonable doubt," the court denied defendant's section 1172.6 petition.

Defendant appealed and as noted above, the matter is before us now after merits briefing. In particular, our order vacating submission under *Delgadillo* requested, citing *Pittman*, that the parties brief the following issue: "[W]hether the trial court addressed defendant's request to consider his age and related youthful offender characteristics in determining whether he acted with the requisite malice for attempted murder." The order also contemplated briefing on whether trial counsel failed to address the youth issue or secure a ruling on it, if defendant asserted IAC below.

## DISCUSSION

The parties have ably and thoroughly presented their merits briefing and, after our foregoing review of the OSC proceedings and the governing law, our discussion is brief.

Respondent's initial primary contention is that because the issue of guilt for attempted murder turns on express malice—an actual intent to kill, even if not premeditated—*Pittman* is distinguishable. Respondent argues based on this distinction that the youth factors discussed in *Pittman* related to whether a defendant committed implied malice murder are "irrelevant" to determining the mental state of a defendant accused of attempted murder. We are dubious of respondent's distinction but, as we explain, we need not resolve the question here.

In *Pittman*, the appellate court agreed with the defendant that the trial court should have considered factors related to his relative youth when it determined at his section 1172.6 evidentiary hearing that he was guilty of implied malice murder. (*Pittman*, *supra*, 96 Cal.App.5th at pp. 416-418.) The defendant in *Pittman* was 21 years old at the time of his offense. (*Id.* at p. 416.) *Pittman* concluded, quoting a then-recent case in a then-emerging body of authority, that "given the timing of the cases deciding that youth is a relevant factor bearing on mental state in section 1172.6 petitions, ' " ' it is unlikely . . . that the trial court [or the parties] could have known to consider [Pittman's] age and maturity level.' " ' " (*Pittman*, at p. 416, bracketed language inserted by *Pittman*, quoting *People v. Oliver* (2023) 90 Cal.App.5th 466 [the defendant in *Oliver* was 23 years old].) Holding that "Pittman's youth is a relevant factor in assessing whether he formed the requisite mental state for conviction," the *Pittman* court reversed the denial of

10

the defendant's section 1172.6 petition and remanded for a new evidentiary hearing. (*Pittman*, at p. 404.)

Respondent distinguishes *Pittman* because it involved an implied malice murder finding rather than express malice. That distinction is accurate, but likely of limited value generally, and of no value here. It has limited general distinguishing value because it is also true that many of the cases *Pittman* discussed arose in the context of considering the relevance of youthful offender factors to upholding felony murder jury findings. (See *Pittman*, *supra*, 96 Cal.App.5th at pp. 416-417.) *Pittman* found those factors "apply equally in the context of implied malice murder." (*Id.* at p. 417.)

We are skeptical of respondent's claim those same factors are irrelevant to whether a youthful defendant harbored express malice. For instance, the "policy interests" *Pittman* identified as being at stake in both felony murder and implied malice murder—including "that youth is relevant to a criminal defendant's ability to perceive risk and consequences, and therefore to the level of culpability" (*Pittman*, *supra,* 96 Cal.App.5th at p. 417)—appear to apply equally to express malice. In this vein, *Pittman* looked to "cases discussing the role of youth in relation to criminal culpability," and found those cases " 'stress[ed] two areas': youthful offenders' 'relative impulsivity' and 'their vulnerability to peer pressure.' " (*Id*. at p. 418.) *Pittman* noted settling recognition in the case law that " ' "[t]ransient rashness," ' ' " 'impetuosity' " ' and ' " 'failure to appreciate risks and consequences' " ' are hallmarks of an immature brain." (*Ibid.*) Thus, *Pittman* cited "nearly uniform[]" "[r]ecent appellate cases" concluding "that a defendant's youth—defined, roughly, as being 25 years of age and younger—is a factor within the

totality of circumstances relevant to the requisite mental state for felony murder" and, as *Pittman* held, implied malice murder. (*Id.* at p. 416.[2])

It seems likely these factors would be equally relevant, contrary to respondent's claim, to determining whether a young person had the actual intent to kill necessary for attempted murder. Such factors could indicate the person was carried away or overwhelmed by impulsivity, rashness, susceptibility to suggestion or command, or otherwise lacking the requisite express malice mental state at the moment of truth.

We need not, however, enter into an extended discussion or analysis that respondent invites with contrary arguments on this question. Instead, even assuming arguendo that defendant is correct that consideration of his relative youth was required, as in *Pittman*, for the trial court to determine whether he harbored the requisite mental state, the record and the standard of review require that we conclude the court did so.

In particular, when defense counsel cited *Pittman*'s importance regarding defendant's "age" for "assess[ing] specific intent," the trial court expressly affirmed "I'll look at [it]." We must presume the court did so. (Evid. Code, § 664 [official duty regularly performed].) Defendant faults the trial court for not specifically mentioning his relative youth in its ruling. But as defendant acknowledges, a reviewing court presumes the trial court follows the law and duly considers the matters and evidence presented to it.

---

[2] The only outlier noted by *Pittman* in the emerging case law did so by implication at most; namely by "discussing" as *Pittman* noted, "[the] defendant's youth, but suggesting that consideration was more relevant to the question whether he should be released on parole." (*Pittman*, *supra*, 96 Cal.App.5th at p. 417, citing *People v. Mitchell* (2022) 81 Cal.App.5th 575, 595].)

(*In re Julian R.* (2009) 47 Cal.4th 487, 499; *In re Jones* (2022) 86 Cal.App.5th 1076, 1092 (*Jones*).)  Thus, "[i] the usual case, the fact that a court did not specifically mention certain evidence does not mean that the court 'ignored' that evidence." (*Jones*, at p. 1092.)

Defendant argues that, as in *Jones*, departure from the presumption is warranted because of the then-newly-coalescing authority spotlighted in *Jones* and *Pittman* recognizing consideration of relative youthfulness even for defendants in their twenties. (See *Jones*, *supra*, 86 Cal.App.5th at p. 1092 [based on the date of the defendant's § 1172.6 evidentiary hearing, "it is unlikely in this particular instance that the trial court could have known to consider [20-year-old] Jones's age and maturity level"].)  Defendant also turns to *Pittman* in this regard.  There, the appellate court observed that the trial court "did not mention the [emergent youth] subject in its otherwise comprehensive ruling." (*Pittman*, *supra*, 96 Cal.App.5th at p. 417.)  As quoted by defendant, *Pittman* concluded:  "We cannot, therefore, assume the trial court implicitly considered it." (*Ibid.*)

Defendant's reliance on *Jones* and *Pittman* is flawed.  Defendant omits that in *Pittman* "there was *no discussion* of Pittman's youth in the proceedings in the trial court" whatsoever. (*Pittman*, *supra*, 96 Cal.App.5th at p. 417, italics added.)  In *Jones*, similarly, while the defendant's trial counsel pointed to established case law concerning youthful mitigation for minor defendants, counsel did not mention the then-recent authority extending those considerations to young adult defendants like Jones. (See *Jones*, *supra*, 86 Cal.App.5th at p. 1092 [trial court's decision omitted discussion of youth

13

factor "just a few weeks after" *People v. Harris* (2021) 60 Cal.App.5th 939 was decided, "without any remonstrance by defense counsel"].)

In contrast, as we set out *supra* in detail, defendant's trial counsel repeatedly from beginning to the end of the evidentiary hearing—stretched over multiple hearing dates— continually raised the issue of defendant's relative youth. Our full review of the lengthy hearing proceedings, guided by the parties' briefing, shows that the issue was not just raised on an isolated occasion and perhaps forgotten. Instead, it was thoroughly presented as a central theme at the hearing and, on this record, we presume considered by the trial court. In particular, in reviewing *Pittman* as the trial court promised it would, the court became, if it were not already, well-versed in considering youth in determining guilt for young adult defendants, exactly as defendant requested.

Defendant suggests that because the hearing stretched over several months, defense counsel's references to the issue or to *Pittman* may have dulled. To the contrary, however, we review the record in the light most favorable to the trial court's ruling, not against it. (See, e.g. *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) The fact that the hearing extended over multiple dates, and defense counsel each time raised and re-raised the issue of defendant's relative youth, persuades us that the issue and applicable authority were considered by the trial court. On this record, moreover, we cannot say there was any ineffective assistance of counsel in trial counsel's thorough presentation of the issue.

## DISPOSITION

The trial court's ruling denying defendant's section 1172.6 petition is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER _____
J.

We concur:

McKINSTER _____
<br>     Acting P. J.

FIELDS _____
<br>     J.